******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* CHYWON WRIGHT
(SC 19233)
(SC 19234)

Rogers, C. J., and Palmer, Zarella, McDonald, Espinosa,
Robinson and Vertefeuille, Js.

*Argued February 10, 2015—officially released April 19, 2016*

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, *David A. Gulick*, senior assistant state's attorney, and *Rocco A. Chiarenza*, assistant state's attorney, for the appellant in Docket No. SC 19233 and the appellee in Docket No. SC 19234 (state).

*Annacarina Jacob*, senior assistant public defender, for the appellee in Docket No. SC 19233 and the appellant in Docket No. SC 19234 (defendant).

*Opinion*

ZARELLA, J. The defendant in these certified appeals, Chywon Wright, was convicted of various crimes stemming from his involvement in a sexual assault that occurred on November 1, 2008. On that date, "the victim[1] accompanied Bryan Fuller, a member of a street gang, to a vacant second floor apartment at 19 Taylor Street in [the city of] Waterbury. The victim went to the apartment expecting Fuller to pay her $250. Fuller's fellow gang members, including the defendant, were present at the apartment. Inside the apartment, several of the gang members, including the defendant, took turns openhandedly hitting the victim on her breasts, buttocks and vagina, and engaged in oral intercourse with the victim for approximately one-half hour.

"The victim was then moved to a second room. In this room, the defendant engaged in oral intercourse with the victim and vaginally penetrated the victim while wearing a black plastic convenience store bag on his penis. Also, in that room, several of the defendant's fellow gang members engaged in oral, vaginal and anal intercourse with the victim. These events lasted for approximately one and one-half hours. Eventually, the victim left the apartment, wearing her clothes but leaving her shoes, cell phone and purse behind. Shortly thereafter, the victim went to Saint Mary's Hospital in Waterbury, where she reported the sexual assault and the medical staff [examined her and utilized] a sexual assault evidence collection kit . . . ." (Footnote added.) *State* v. *Wright*, 144 Conn. App. 731, 733–34, 73 A.3d 828 (2013).

Subsequently, the defendant was charged with, and found guilty of, two counts of aggravated sexual assault in the first degree in violation of General Statutes § 53a-70a (a) (4) and one count each of conspiracy to commit aggravated sexual assault in the first degree in violation of General Statutes §§ 53a-70a (a) (4) and 53a-48 (a), conspiracy to commit kidnapping in the first degree in violation of General Statutes §§ 53a-92 (a) (2) (A) and 53a-48 (a), assault in the third degree in violation of General Statutes § 53a-61 (a) (1), and conspiracy to commit assault in the third degree in violation of §§ 53a-61 (a) (1) and 53a-48 (a).[2] The trial court, *Cremins, J.*, rendered judgment in accordance with the jury verdict and sentenced the defendant to a total effective term of twenty years of incarceration and ten years of special parole.

The defendant appealed to the Appellate Court from the trial court's judgment, claiming, first, that the trial court improperly had precluded him from introducing certain evidence of the victim's prior sexual conduct, thereby violating his constitutional rights of confrontation and to present a defense. Id., 735–36. Second, the defendant claimed that his sentence on all three con-

spiracy counts, which were based on a single agreement with multiple criminal objectives, violated the double jeopardy clause of the federal constitution. Id., 745. The Appellate Court rejected the defendant's first claim, concluding that "[t]he record demonstrates that although the [trial] court initially precluded the [defense] from presenting evidence as to the victim's prior sexual conduct, it later allowed the [defense] to present such evidence to the jury." Id., 744–45. The Appellate Court did agree, however, with the defendant's double jeopardy claim. See id., 747. The Appellate Court further concluded that, under *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013), the proper remedy for such violation was to remand the case to the trial court with direction to vacate the judgment as to two of the conspiracy counts, to render judgment on one of the conspiracy counts, and to resentence the defendant accordingly. *State* v. *Wright*, supra, 144 Conn. App. 748–49. The defendant and state each appealed from the Appellate Court's judgment, and we granted certification in both appeals. The defendant claims that the Appellate Court incorrectly concluded that the trial court had appropriately limited, under General Statutes § 54-86f,[3] his ability to present evidence of the victim's prior sexual conduct. In its appeal, the state argues that the Appellate Court incorrectly concluded that vacatur was the appropriate remedy for the double jeopardy violation stemming from the sentence for the defendant's conviction on the three conspiracy counts. After oral argument, we ordered supplemental briefing in the defendant's appeal. The parties were asked to brief (1) whether *State* v. *DeJesus*, 270 Conn. 826, 856 A.2d 345 (2004), should be overruled to the extent that it construed the term "material," as used in § 54-86f (4), to refer to material in the constitutional sense rather than the evidentiary sense, (2) if the first question is answered in the affirmative, whether the trial court improperly excluded the challenged evidence, and, if so, whether such error is subject to harmless error analysis, and (3) if questions one and two are answered in the affirmative, whether the exclusion of the challenged evidence was harmless beyond a reasonable doubt. Additional facts and procedural history will be set forth as necessary.

I

We first address the defendant's argument that the trial court violated his constitutional rights of confrontation and to present a defense through its application of § 54-86f. The defendant contends that the trial court's application of § 54-86f, the rape shield statute, improperly precluded defense counsel from questioning the victim in the presence of the jury about certain sexual conduct that closely preceded the Taylor Street incident, namely, (1) the victim's offer to Fuller to have sex with multiple men, for multiple hours, for $500, and (2) the victim's act of engaging in consensual oral sex

with Fuller and his friend at a different residence on Wolcott Street in Waterbury for the promise of $250. The defendant argues that these lines of inquiry would have supported his defense theory that the Wolcott Street conduct was part of a larger, consensual, sex-for-hire transaction that extended to Taylor Street, and that the victim had fabricated allegations of sexual assault and other crimes after she was not paid for the transaction. His alternative defense theory was that he reasonably believed that the victim had consented to having sexual relations with him at Taylor Street. Citing *State* v. *DeJesus*, supra, 270 Conn. 826, and *Demers* v. *State*, 209 Conn. 143, 547 A.2d 28 (1988), the defendant maintains that evidence of a victim's prostitution may be relevant and material in a sexual assault case if consent is raised as a defense. Thus, the defendant argues that defense counsel should have received greater latitude in his examination of the victim under the exception to the rape shield statute providing that evidence of the sexual conduct of a victim may be admissible if it is "so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights." General Statutes § 54-86f (4). In his supplemental brief, the defendant further claims that this court incorrectly concluded in *DeJesus* that evidence must be material in the constitutional sense to be admissible under § 54-86f (4) and, therefore, should be overruled. Moreover, the defendant avers that the excluded evidence was both relevant and material in an evidentiary sense and that its exclusion violated his constitutional rights of confrontation and to present a defense. Finally, the defendant claims that the state cannot demonstrate that such error was harmless beyond a reasonable doubt.

In response, the state argues that defense counsel was allowed to question the victim about the two afore-mentioned prostitution related topics and thus was not actually restricted from developing either of the defense theories of consent.[4] In its supplemental brief, the state agrees with the defendant that *DeJesus* should be overruled insofar as this court held that the term "material," in the context of § 54-86f (4), means material in the constitutional sense. Nevertheless, the state maintains that the trial court allowed defense counsel to question the victim and others regarding the $250 payment and the offer to engage in sexual activities for $500, and, thus, the court reasonably exercised its discretion and upheld the defendant's constitutional rights. The state also claims that, even if the trial court improperly excluded the evidence, such error was harmless beyond a reasonable doubt.

A

The record reveals the following additional facts and procedural history that are relevant to the resolution of this claim. On the first day of trial, the state com-

menced its case by calling the victim as a witness. The victim testified before the jury to the following facts: On November 1, 2008, she went into a second floor apartment on Taylor Street because Fuller owed her money and told her that it was inside. After she entered the apartment, someone immediately locked the door behind her. The defendant and his fellow gang members crowded around the victim, yelled curses at her, yanked at her clothes, and took turns openhandedly hitting her breasts, buttocks, and vagina. The victim was frightened and scared of being hurt, and complied with an order from Elizer Gibbs, who was the gang's ringleader, to remove her clothes and to get on her knees. The defendant then made the victim perform oral sex on him. Five or six of the defendant's fellow gang members similarly forced the victim to have oral sex with them.

The victim later went into a different room where Gibbs urinated on her face and body. The defendant then took a plastic bag from the floor, covered his penis with it, and vaginally penetrated the victim. The victim explained that this felt as though "there [were] a thousand knives in [her] vagina." Other gang members thereafter took turns having compelled oral, vaginal, and anal sex with the victim. They also penetrated the victim with sex toys that they found in her purse. The gang members tried to convince a nearby woman, Yamile Rivera, to partake in penetrating the victim with the sex toys, but Rivera rebuffed their efforts and instead punched the victim in the face.

At one point, while the victim was with the gang members, she used her cell phone to call a friend, Catherine Jortner. The victim was allowed to make the call, while being monitored on speakerphone, after she told everyone that "another girl would come up and . . . join the fun . . . ." When no one appeared to be paying attention, the victim told Jortner, "I need help . . . ." One of the gang members noticed this cry for help, however, and "took the cell phone and said into it, 'your friend's about to get fucked up,' and then threw the phone against the wall."[5] Eventually, after being forced to engage in additional sexual activities, the victim was allowed to take a cigarette break on a second floor porch. On the porch, someone commented that they could be the victim's "pimp . . . ." Gibbs interrupted the victim's cigarette break by telling her, "get back in the house, we're not done with you yet." Members of the gang resumed forcing the victim to have various forms of sex but complained that her vagina was dry. Someone then inserted a forty ounce beer bottle into the victim's vagina and poured beer inside of her. The victim later saw Fuller in a bathroom and remarked that what had happened "was really messed up," to which Fuller responded that "it wasn't supposed to go down like that." She explained that she understood that to mean "that his friends got out of control and that they weren't supposed to do that."

Finally, the victim was able to dress and leave Taylor Street but was in such a hurry to do so that she left her shoes and other personal belongings behind. As the victim walked home, the defendant followed her, asking if she "like[d] what happened in there?" The victim, who was crying, replied, "no," and the defendant proceeded to taunt her by telling male bystanders that she would "get [them] off" for $20. When she arrived home, the victim told three different friends that she had been raped and needed to go to the hospital. The victim went to Saint Mary's Hospital later that night, where she was examined and the police were contacted. The victim's direct examination concluded with her testimony that she never consented to having any form of sex with the defendant, or anyone else, while she was at Taylor Street.

During cross-examination of the victim,[6] defense counsel attempted to ask her why Fuller owed her money. After the assistant state's attorney (prosecutor) objected to that question on the ground that it was covered by a motion in limine, the trial court excused the jury from the courtroom. Defense counsel explained that, although he had not filed any response to the state's motion in limine, he was raising consent as a defense and wished to question the victim about certain prior sexual conduct pursuant to § 54-86f (4). Under the circumstances, the trial court determined that it was necessary to hold a rape shield hearing before the jury returned.

During the hearing, the victim testified that, prior to going to Taylor Street, she had a conversation with Fuller in which she had offered to have sex with him and three other people for four hours in exchange for $500. The victim further testified that, ultimately, she engaged in sexual activities with Fuller and another person at Wolcott Street for the promise of $250. Fuller did not have any money when those sexual activities concluded, however, and took the victim to Taylor Street. On the way, Fuller explained that there would be three or four other people at Taylor Street, but the victim did not believe that there was a plan for her to have sex with them. After hearing this testimony and arguments from the state and the defense, the trial court determined that there was an insufficient offer of proof to establish the victim's consent to engage in sexual relations with the defendant or the defendant's reasonable belief that such consent had occurred. Consequently, the trial court ruled that questions about the victim's prior sexual conduct at Wolcott Street would be precluded until the defense presented an adequate offer of proof as to consent.

Later, during the state's case-in-chief, the prosecutor sought to admit a redacted version of the defendant's statement to the police into evidence. After excusing the jury from the courtroom, the trial court reviewed

the redacted text. This portion of the text stated that, after Fuller and the victim arrived at Taylor Street, Fuller had pulled the defendant aside to say "that he told this girl that he was gonna give her some money because he was with her all day, and she was giving him and another boy head all day." The trial court found that this text reflected the defendant's knowledge that the victim was a prostitute and thus implicated the issue of consent. The trial court ruled that, if the prosecutor wanted to admit the defendant's statement to the police into evidence, he needed to do so using a version that was not redacted.

Once the jury returned, a complete version of the defendant's statement to the police was read into evidence. It included the following admissions: "[A]round Halloween, I was over on Taylor Street . . . chilling with my homies. . . . [We] are all 'Bloods.' . . . While we was there, another guy that is a Blood showed up, he is [Fuller], and he was with [the victim]. . . . Then [Fuller] grabbed me aside and said that he told this girl that he was gonna give her some money because he was with her all day, and she was giving him and another boy head all day. Giving head means getting oral sex. I heard [Fuller] tell this girl that the money he owes her is upstairs on the second floor but I knew he was lying to her because he told me that and I also know that the second floor is a vacant apartment. The girl kept asking him for the money, so we all went up to the second floor . . . . The whole time this was going on the girl thought she was gonna get her money, but [Fuller] was telling all of us that we was gonna fuck this girl. . . . I was the first one to get my dick sucked. [Gibbs] told the girl to suck me first. . . . Then [Gibbs] was telling us all to smack her ass, so we all took turns doing it. The reason we do what [Gibbs] says is because he is a General in the Bloods, which means he is in charge . . . . I know she didn't like us smackin her ass because she told us it hurt and to stop. [Gibbs] told her to shut up and take it. . . .

"After some time, I started to fuck this girl from behind. I didn't have a rubber so I used a black plastic bag . . . . Then this girl said she wanted to call a friend . . . to come over. She said that her friend would want to do this too. While she was on her cell phone, [Gibbs] snatched the phone from her and threw it. . . . Then I grabbed the . . . girl and put her head on my dick so she would suck it. . . . Then the other guys took turns telling this girl that she better suck their dicks . . . . We kept telling her that she likes it. I could tell at this point that this girl wasn't liking this and she started to look scared. . . . Then [Gibbs] found some [sex toys] in this girl's pocketbook and took them out and started to use them on the girl. . . . Then the girl was on her knees and [Gibbs] told her to open her mouth and, when she opened her mouth, [Gibbs] pissed in her mouth and all over her. . . . [Gibbs] was telling

[Rivera] to smack the girl but [Rivera] just punched her in the face. We were all trying to get [Rivera] to mess around with this girl . . . . The . . . girl then said that she was scared and afraid that we was gonna kill her. We was telling her that we ain't gonna kill her but we wanna fuck her. I told her to shut up and put my dick in her mouth, so she did. . . . [W]e wasn't letting her leave until we were done with her. . . . [Later on, someone] put a [forty ounce] bottle of beer in the girl's [vagina]. . . . Then the girl left and walked down the street. A few minutes after she left Taylor Street, I left too. . . . [A]s I walked by her, I asked her if she liked what happened, and she was like, 'no.' I could see she was crying real hard. I didn't say nothing else and just kept walking and I went home."

Subsequently, the prosecutor called Steven Garrett, one of the defendant's fellow gang members who was present at 19 Taylor Street on November 1, 2008. In large part, Garrett's testimony was consistent with the undisputed facts. In his brief, however, the defendant claims that "Garrett testified that [the victim] had not been forced to engage in sex" and "consented" to the sexual acts. This characterization of Garrett's testimony is generous. Garrett testified that he *personally* did not force the victim to have oral sex and that she seemingly "accepted" having sexual relations with others "at first . . . ." Indeed, Garrett disclaimed any knowledge as to whether the defendant had forced the victim to engage in any sexual acts. Garrett also testified that the victim looked afraid after Gibbs urinated on her. While he was in the apartment, Garrett did not think that the victim was free to leave because Gibbs would not have let her. In fact, throughout the course of the sexual assault, Garrett left the apartment at least three times, and, upon returning each time, the apartment door was locked.

Garrett further testified that, during the victim's cigarette break, he talked to the victim about "pimping" her. Specifically, he said "she don't need to be doing what she's doing at that moment in time to get money when I know people, older guys, that get . . . Social Security [Income] checks . . . that would . . . give more for less." The victim did not respond to Garrett. Later, Garrett took credit for pouring beer into the victim's vagina and laughing about it.

The prosecutor also called Fuller as a witness, who gave inconsistent testimony regarding what the victim knew prior to and when arriving at Taylor Street. Fuller initially testified that he brought the victim to Taylor Street with assurances that she would be paid after she "[took] care of [his] boys . . . ." Fuller then refreshed his memory with a copy of his statement to the police, however, and repeatedly testified that the victim was unaware that she was being brought to Taylor Street to have sex.[7] Near the conclusion of his testimony, Fuller clarified that there was no preexisting arrange-

ment for the victim to have sex with the gang members at Taylor Street for money; rather, the victim was merely expecting to retrieve a $250 payment there. Without the victim's knowledge, however, Fuller had called ahead to two gang members at Taylor Street and *told them* that he was bringing the victim over to have sex.[8] In his own words, Fuller's "whole intention [was] for [the victim] to go there and [to] have sex with them," and he "set the whole thing up without her know[ledge] [of that intention] . . . ." Fuller testified that, following the victim's arrival at Taylor Street, she was forced to give the defendant oral sex at Gibbs' urging.[9] According to Fuller, Gibbs was swearing and angrily saying things like "give them head, have sex with us or you're not going nowhere." Fuller verified that the victim was urinated on, penetrated with a plastic bag, and penetrated with a forty ounce beer bottle. Fuller also testified that, during the victim's subsequent cigarette break, the gang members told the victim that she could leave, but Fuller "could tell by [her] facial expression and by her voice . . . she was a little scared [that], if she left, something would happen to her." Eventually, Fuller encountered the victim in the bathroom immediately before she departed and told her that "it wasn't supposed to go down like that."

The defense commenced its case by recalling the victim as a witness. The victim testified that she had told Fuller that she would "do some stuff for 500 bucks." As defense counsel attempted to explore this topic through questioning, the prosecutor objected, and the trial court excused the jury from the courtroom. The victim then explained that the $500 was supposed to be compensation for activities on Wolcott Street. She also reiterated that Fuller had told her that she could collect $250 at Taylor Street. The victim testified that she had no intention of having sexual relations with the men at Taylor Street and that she had received no payment for doing so. Interjecting, the trial court explained that it was not persuaded that the Wolcott Street and Taylor Street incidents were part of a single transaction, and ruled that asking the victim about her prior sexual conduct on Wolcott Street would not be allowed pursuant to § 54-86f.

The jury returned, and defense counsel continued questioning the victim. She denied ever making an offer to Fuller to have sex with multiple people at Taylor Street for $250 or $500. When the victim was asked, more generically, if she had a conversation with Fuller during which "$500 came up as a fee for [her] services," she responded, "[r]ight, for Wolcott Street." Using a copy of the victim's statement to the police, defense counsel attempted to refresh her recollection with respect to the details of this conversation about the $500 fee, but the trial court interrupted and again excused the jury. Defense counsel explained that, in the victim's statement to the police, she had described telling Fuller

"he could do whatever he wanted for four hours [for $500]." The trial court cautioned that, "[t]o the extent that the $500 related to discussions at Wolcott Street, I am not allowing that."

Defense counsel then called Fantasia Daniels as the final defense witness. Daniels testified that she saw the victim at Taylor Street on the night of the incident and, moreover, that the victim had said that she was there "for sex with the guys." According to Daniels, the victim stated that "[s]he [had] to use her [sex] toys to get started" and seemed to like what had transpired because she was smiling during the cigarette break. Daniels testified that, at the end of the night, the victim asked Fuller where her $250 was. After Fuller replied "there's no [$250]," the victim said she was going to report the matter to the police.[10] After this questioning of Daniels, the defense rested its case.

B

Prosecutions for sexual assault are governed by special rules of evidence, including § 54-86f. That statute "was enacted specifically to bar or limit the use of prior sexual conduct of an alleged victim of a sexual assault because it is such highly prejudicial material." (Internal quotation marks omitted.) *State* v. *Rolon*, 257 Conn. 156, 176, 777 A.2d 604 (2001). In enacting § 54-86f, the legislature intended to "[protect] the victim's sexual privacy and [shield the victim] from undue harassment, [encourage] reports of sexual assault, and [enable] the victim to testify in court with less fear of embarrassment. . . . Other policies promoted by the law include avoiding prejudice to the victim, jury confusion and waste of time on collateral matters." (Citation omitted; internal quotation marks omitted.) *State* v. *Christiano*, 228 Conn. 456, 469–70, 637 A.2d 382, cert. denied, 513 U.S. 821, 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994).

Thus, to determine whether the prostitution related evidence was properly excluded, we must begin our analysis with the relevant language of the rape shield statute. Section 54-86f prohibits a defendant from presenting evidence of an alleged sexual assault victim's prior sexual conduct, "unless such evidence is [among other things] . . . otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights." General Statutes § 54-86f (4).

In *State* v. *DeJesus*, supra, 270 Conn. 841–42, we addressed the meaning of "material" in the context of § 54-86f (4). In that case, we concluded that subdivision (4) of § 54-86f referred to the constitutional standard for materiality, and, relying on *United States* v. *Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), and *United States* v. *Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), held that evidence was material only "if, considering the case without the excluded evi-

dence, there is a probability sufficient to undermine confidence in the guilty verdict." *State* v. *DeJesus*, supra, 842. In the present case, we consider whether *DeJesus* was correct on this point.

The defendant and the state both argue that *DeJesus* should be overruled insofar as it held that § 54-86f (4) refers to materiality in the constitutional sense. The defendant claims that the plain language of the statute demonstrates that the legislature was referring to nothing more than the ordinary test for the admissibility of evidence, namely, that the evidence is relevant and material, and that evidence is material in the evidentiary sense "if it is of consequence to the determination of the action." He further asserts that such a reading of the statute is supported by the legislative history. In addition, the defendant contends that our current reading of the statute places trial courts in the nearly impossible position of having to apply an appellate standard of review at trial. Similarly, the state claims that "material" is a legal term of art with two plausible meanings, namely, materiality in the constitutional sense or materiality in the evidentiary sense, and that the structure of the rape shield statute supports the inference that the legislature intended to refer to material in the evidentiary sense. The rape shield statute establishes four exceptions to the inadmissibility of an alleged victim's prior sexual conduct. The first three cover specific types of sexual conduct evidence[11] and the fourth is a catchall exception that allows for the admission of unspecified sexual conduct evidence. The first three exceptions to the rape shield statute, the argument goes, reflect the legislature's judgment as to what types of sexual conduct evidence are material, whereas the fourth exception allows for the admission of other types of sexual conduct evidence after materiality has been established.[12] The state claims that there is nothing to suggest that the legislature intended it to be more difficult to introduce evidence under the fourth exception than it is under the first three exceptions.

The interpretation of the term "material" is a question of statutory construction. When construing a statute, we strive to determine the legislative intent, and, in doing so, we begin with the text of the statute. See, e.g., *State* v. *Smith*, 317 Conn. 338, 347, 118 A.3d 49 (2015); see also General Statutes § 1-2z. If the legislature's intent is clear from the statute's language, our inquiry ends. See *State* v. *Smith*, supra, 346–47. If, however, the statute is ambiguous or its plain meaning yields an absurd result, we go on to consider extratextual evidence of its meaning, such as the statute's legislative history, the circumstances surrounding its enactment, the legislative policy the statute implements, and the statute's relationship with existing legislation and common-law principles. E.g., *State* v. *LeFleur*, 307 Conn. 115, 126, 51 A.3d 1048 (2012).

The relevant text of § 54-86f (4) provides: "In any prosecution for sexual assault . . . no evidence of the sexual conduct of the victim may be admissible unless such evidence is . . . otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights." The statute does not define the term "material." Generally, when a statutory term is not defined, we presume that it was intended to have its ordinary meaning as expressed in standard dictionaries. See, e.g., *State* v. *LaFleur*, supra, 307 Conn. 128. In the present case, however, we believe that "material" is a legal term of art because it is used in conjunction with "relevant" and is found in an evidentiary statute. Thus, we will look to legal dictionaries and authorities to ascertain its meaning.

Around the time § 54-86f was enacted in 1982; see Public Acts 1982, No. 82-230; Black's Law Dictionary defined "material" as: "[i]mportant; more or less necessary; having influence or effect; going to the merits; having to do with matter, as distinguished from form. Representation relating to matter which is so substantial and important as to influence party to whom made is material." (Internal quotation marks omitted.) Black's Law Dictionary (5th Ed. 1979) p. 880. The fifth edition of Black's Law Dictionary also provided the following definition for "material evidence": "That quality of evidence which tends to influence the trier of fact because of its logical connection with the issue. Evidence which has an effective influence or bearing on question in issue is material. . . . Materiality of evidence refers to pertinency of the offered evidence to the issue in dispute. . . . Material evidence is evidence which is material to question in controversy, and which must necessarily enter into the consideration of the controversy, and which by itself or in connection with other evidence is determinative of the case." (Citations omitted; internal quotation marks omitted.) Id., p. 881. In light of the foregoing definitions, we might conclude that § 54-86f (4) refers to the evidentiary standard of "material," that is, evidence is material when it has an influence, effect, or bearing on a fact in dispute at trial.

That is not, however, the only plausible definition. The law has given "material" another meaning as well, as we noted in *DeJesus*. See *State* v. *DeJesus*, supra, 270 Conn. 841–42. In *DeJesus*, we adopted the United States Supreme Court's constitutional standard for materiality in determining the meaning of material in § 54-86f (4). Id., 841. Under the constitutional standard, "[e]vidence is material only if there is a reasonable probability that, had the evidence been [presented at trial], the result of the proceeding would have been different." Id., quoting *United States* v. *Bagley*, supra, 473 U.S. 682 (opinion announcing judgment). Because there are two plausible meanings of "material" in the context of § 54-86f (4), we also must consider extratex-

tual evidence, specifically, the circumstances surrounding the enactment of § 54-86f, the statute's legislative history, and the policy objectives that § 54-86f was intended to implement. See, e.g., *State* v. *LaFleur*, supra, 307 Conn. 126.

It is important to understand the state of the law when the rape shield statute was enacted. See, e.g., *State* v. *Fernando A.*, 294 Conn. 1, 19, 981 A.2d 427 (2009) ("the legislature is presumed . . . to know the state of existing relevant law when it enacts a statute" [internal quotation marks omitted]). In 1978, this court decided *State* v. *Mastropetre*, 175 Conn. 512, 400 A.2d 276 (1978), in which the defendant, Michael Mastropetre, argued that the trial court improperly ruled that a sexual assault victim did not have to answer defense counsel's question regarding whether she had had sexual relations with men other than Mastropetre prior to the assault. Id., 514. On direct examination, the victim was asked if Mastropetre had achieved an orgasm during the assault, to which she replied: " 'I think so.' " Id. Then, during cross-examination, defense counsel asked the victim whether she was certain that Mastropetre had an orgasm. Id. The victim responded that she was not sure. Id. Defense counsel then asked the victim if, prior to the assault, she had had sexual relations, to which she responded " 'With him? No.' " Id. She was then asked, " '[w]ith anyone else?' " Id. She replied: " 'That has nothing to do with this. Why should I answer that?' " Id. The trial judge agreed that the victim did not have to answer the question. Id.

On appeal, Mastropetre argued that the victim's prior sexual conduct was relevant to the issues of consent and the victim's credibility. Id., 515, 518. We first concluded that the evidence was not admissible as to the issue of consent because Mastropetre denied engaging in sexual conduct with the victim, and, therefore, consent was not truly at issue. Id., 516. Moreover, we acknowledged that the victim's prior sexual conduct with people other than Mastropetre was irrelevant to consent because "[t]he fact that a [victim] may have consented to sexual relations with others before does not, without more, tend to establish that consent was given on the occasion in question." Id., 517.

We next considered whether such evidence was relevant in weighing the victim's credibility. See id., 518–20. We began by dividing that question into two issues: "(1) whether the question [posed by defense counsel] was admissible to impeach the [victim], and (2) whether it was admissible to clarify the source of semen found in the [victim] on the night of the alleged crime . . . ." Id., 518. On the issue of impeachment, we concluded that, as a general rule, a victim's sexual conduct does not "reflect [on] his or her credibility," and, therefore, evidence of such conduct is not admissible for impeachment purposes. Id., 518–19. We did note, however, an

exception to that general rule. When a victim testifies regarding her chastity prior to the assault, a defendant is entitled to test that statement during cross-examination. Id., 518.

As to Mastropetre's second credibility argument, namely, clarification regarding the source of the semen, we approved of his reasoning: "[Mastropetre's] reasoning is correct: that is, had [defense counsel] asked whether the [victim] had had sexual relations with someone other than [Mastropetre] at any time within the two or three days prior to the assault, the question would have been [proper] on the issue of whether [Mastropetre] was responsible for the semen, raising doubts as to the [victim's] credibility." Id., 519. Defense counsel's question was not limited to the period immediately preceding the assault, however, and we thus determined that the exclusion of the question was proper. See id., 519–20. Furthermore, we noted that evidence regarding the semen was not admitted until after defense counsel's question was asked. Id., 520. We also stated that it is "elementary" that the question would be improper under this theory until after evidence of the semen was presented. Id.

Finally, Mastropetre asserted that barring defense counsel's question regarding the victim's prior sexual conduct violated his confrontation rights. Id. In resolving this claim, we recognized that due process requires that a criminal defendant be afforded a fair opportunity to present a defense and to confront the witnesses against him, and that excluding evidence offered by a defendant, even when such exclusion is in accord with evidentiary rules, infringes on these rights to some extent. See id., 520–21. We further noted, however, that, in cases in which courts had found that the exclusion of a defendant's proffered evidence violated his due process and confrontation rights, "the excluded evidence was clearly relevant and material to a critical issue in the case." Id., 521. Because we had determined that the evidence of the victim's prior sexual conduct was not relevant to any issue in Mastropetre's case, we concluded that the exclusion of defense counsel's question regarding such conduct did not violate Mastropetre's confrontation rights. Id.

In summary, the following can be gleaned from our decision in *Mastropetre*. In a trial on sexual assault charges, the victim's prior sexual conduct is generally not relevant to the issues and is therefore inadmissible. Evidence of such conduct is admissible, however, in some circumstances. Those circumstances include: (1) when there is evidence of semen in the victim and the victim is questioned about his or her sexual conduct with individuals other than the defendant in the days prior to the assault to prove the source of that semen; (2) the victim testifies regarding his or her prior sexual conduct or chastity, and the defendant tests such asser-

tions on cross-examination; (3) consent is an issue at trial, and the defendant offers evidence of prior sexual conduct between the victim and the defendant; and (4) when excluding the evidence would violate the defendant's right to confront witnesses and to present a defense.[13] Also evident from *Mastropetre* is that we were concerned with excluding evidence that was material, in the evidentiary sense, to a matter at issue. When we spoke of evidence being material, we spoke of its materiality to a *critical issue*, and not to the trial as a whole, as we do when we are concerned about materiality in a constitutional sense. We also noted that, when the defendant's evidence is irrelevant or more prejudicial than probative, it could be excluded without violating his constitutional rights and without the need to consider whether the exclusion of such evidence would undermine our confidence in the outcome of the trial.

We presume, as we must, that the legislature was aware of *Mastropetre* when it enacted § 54-86f in 1982. See, e.g., *State* v. *Fernando A.*, supra, 294 Conn. 19. Even without such a presumption, it is apparent that the statute was modeled after *Mastropetre*. For example, the four instances we have identified in which a victim's sexual conduct can be admitted into evidence are the same exceptions codified in § 54-86f. Additionally, the Office of Legislative Research prepared a document that compared the proposed legislation that became § 54-86f to our decision in *Mastropetre*; Letter from George Coppolo, Research Attorney, Office of Legislative Research, to Representative Alfred J. Onorato, Connecticut General Assembly (March 10, 1982); and, in a letter to the Judiciary Committee, the Office of the Chief State's Attorney noted that the proposed legislation was consistent with our decision in *Mastropetre*. Letter from Austin J. McGuigan, Chief State's Attorney, Office of the Chief State's Attorney, to Members of the Judiciary Committee (September 22, 1982). Therefore, it seems likely that the legislature, when it codified subdivision (4), used material in the same manner we did, namely, the evidentiary sense. There is no evidence that the legislature intended to modify our holding in *Mastropetre*. In fact, Senator Howard T. Owens, Jr., in calling for the passage of the rape shield statute, stated: "The history of it is that there was case law that kind of left this with some ambiguity and we wanted to bring this to a head." 25 S. Proc., Pt. 10, 1982 Sess., p. 3250. Thus, it appears that § 54-86f was intended to clear up whatever ambiguities the legislature found in *Mastropetre* and not to modify or supersede that decision.

Our construction of the term "material" also is supported by a close look at the legislative history of § 54-86f. Section 54-86f was enacted in 1982 through the passage of No. 82-120 of the 1982 Public Acts (P.A. 82-120). When P.A. 82-120 was discussed on the floor of the Senate, Senator Owens made clear that the intent of the bill was to ensure that a victim of sexual assault

could not be questioned about his or her sexual conduct when such conduct was *irrelevant* to the issue at trial, specifically, whether the alleged sexual assault had occurred. See 25 S. Proc., supra, pp. 3249–50. Senator Owens noted that such evidence would be admissible, however, when it was so "relevant and material to a critical issue of the case that excluding it would violate the defendant's constitutional rights." Id., p. 3249. Senator Owens illustrated this exception: "For example, if an individual were to claim . . . as part of his defense that the person that he had the contact with was in fact a prostitute and then there was later a claim of rape or a situation where someone was hanging around an [A]rmy base or an [A]ir [F]orce base and enticed people into these types of situations that would be one of the situations that would call for constitutional confrontation and due process would require that." Id.

On the House floor, Representative Onorato noted that P.A. 82-120 dealt with the admissibility of evidence concerning a sexual assault victim's prior sexual conduct and outlined three instances in which such evidence would be admissible, referring to what would become subdivisions (1), (2), and (3) of § 54-86f. 25 H.R. Proc., Pt. 11, 1982 Sess., p. 3532. He further explained: "There's also protection . . . for the violation of constitutional rights . . . ." Id.

Consideration of these statements leads us to conclude that it is difficult to imagine that the term "material" meant anything other than material in the evidentiary sense. Neither Senator Owens nor Representative Onorato described a situation in which courts would consider whether the exclusion of prior sexual conduct evidence would change the outcome of the trial or undermine confidence in the verdict. In fact, Senator Owens gave an example that is particularly instructive in the present case. He explained that evidence suggesting that a sexual assault victim was a prostitute would be admissible under the exception codified in subdivision (4) because the exclusion of such evidence would violate the defendant's constitutional rights to due process and confrontation.[14] See 25 S. Proc., supra, p. 3249.

In *DeJesus*, we decided "that § 54-86f (4) refers to materiality in its constitutional sense" with little explanation. *State* v. *DeJesus*, supra, 270 Conn. 842. Indeed, we did not even consider the other plausible meaning of "material" discussed in this opinion. Instead, we chose to follow the definition for material evidence provided in *United States* v. *Bagley*, supra, 473 U.S. 682 (opinion announcing judgment), without explaining why. *State* v. *DeJesus*, supra, 841. We did not engage in our normal process of statutory construction, and § 1-2z was never mentioned, even though it was in effect at that time.[15]

Moreover, the construction of § 54-86f (4) set forth

in *DeJesus* yields an unworkable result, and the court seemed to acknowledge as much. See id., 842 n.17. Under the construction we gave the term "material" in that case, trial courts are left to decide, either prior to or during trial, whether the exclusion of a particular piece of evidence will, in the event that the trial results in a guilty verdict, undermine the court's confidence in that verdict. This is a precarious position for a trial court. First, there will not yet be a guilty verdict when the court is ruling on the admissibility of the evidence under § 54-86f (4). Second, the court is asked to determine whether the evidence would affect the trial's outcome before all the evidence has been presented and all the testimony heard, making it difficult to determine the impact that the proffered evidence might have on the trial. Third, implicit in *DeJesus* is a perplexing proposition. In that case, we appear to suggest that the trial court could commit error by excluding evidence that the constitution requires the court to admit and, thereafter, determine the harmfulness of the court's error. Finally, *DeJesus* directs trial courts, when making an evidentiary ruling, to consider the impact a single piece of evidence may have on a case, a task we have never before asked trial courts to conduct when making evidentiary rulings. Instead, the analysis required by *DeJesus* is typically reserved for appellate courts, after all the trial evidence has been introduced, a record created, and a verdict reached.

In sum, in light of the statute's text and legislative history, along with the unworkable result that the court in *DeJesus* reached, we conclude that *DeJesus* improperly construed § 54-86f (4) and now overrule that decision to the extent that it determined that "material" refers to the constitutional standard for materiality. Instead, we hold that the legislature intended material to refer to the evidentiary standard, that is, evidence is material when it has an influence, effect, or bearing on a fact in dispute at trial. In addition, we overrule *DeJesus* insofar as the court in that case held that "an evidentiary ruling that excludes evidence properly admissible under § 54-86f (4) . . . requires reversal with no additional evaluation of harm . . . ." Id., 845.

## C

We now turn to the facts of the present case. Because the state contends that defense counsel was not prevented from questioning the victim with respect to the defendant's theories of consent, we must make a threshold determination as to whether the trial court used the rape shield statute to limit the questioning of the victim in the presence of the jury about the following sexual conduct: (1) the victim's offer to Fuller to have sex with multiple men, for multiple hours, for $500; and (2) the victim's act of engaging in consensual oral sex with Fuller and his friend at Wolcott Street for the promise of $250. Our review of the record reveals that,

following the initial rape shield hearing, the court was steadfast in its ruling that defense counsel could not question the victim in the presence of the jury about her sexual conduct that took place prior to the Taylor Street incident. At multiple points during the victim's testimony before the jury, defense counsel posed questions regarding the two prostitution related topics. At each of these points, the trial court ultimately sustained the prosecutor's objections to the questions or excused the jury from the courtroom. The closest defense counsel came to being able to explore the first prostitution related topic with the victim in the presence of the jury was when the victim testified that she told Fuller that she would "do some stuff for 500 bucks" and that she had a conversation with Fuller in which $500 came up as a fee "for [her] services . . . ." This vague testimony does not, however, reflect specifically whether the victim expressed a willingness, shortly before the Taylor Street incident, to have sexual relations with multiple partners for multiple hours. Moreover, defense counsel was unable to question the victim in the presence of the jury about the second prostitution related topic, namely, her act of engaging in consensual oral sex with Fuller and his friend at Wolcott Street for the promise of $250. Accordingly, we agree with the defendant that defense counsel was prevented, by virtue of the trial court's application of the rape shield statute, from pursuing his desired lines of inquiry before the jury with respect to the victim's prior sexual conduct.

Having determined that defense counsel was indeed precluded from questioning the victim in the presence of the jury about certain sexual conduct, we must proceed to consider whether such testimony was so relevant and material to a critical issue in this case— namely, actual consent or a reasonable belief of consent—that precluding the testimony amounted to a violation of the defendant's constitutional rights. See General Statutes § 54-86f (4). "Determining whether evidence is relevant and material to critical issues in a case is an inherently fact-bound inquiry. Relevance [and materiality depend] on the issues that must be resolved at trial, not on the particular crime charged." (Internal quotation marks omitted.) *State* v. *DeJesus*, supra, 270 Conn. 837.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . In considering whether evidence [is] sufficiently relevant to fall under one of the exceptions enumerated

in § 54-86f, we have drawn a distinction between, on the one hand, evidence that is relevant to establish some portion of the theory of defense or [to] rebut some portion of the state's case . . . and, on the other hand, evidence that is offered as an impermissible attempt to establish the victim's general unchaste character [which is] prohibited by [§ 54-86f]." (Internal quotation marks omitted.) *State* v. *Shaw*, 312 Conn. 85, 104–105, 90 A.3d 936 (2014).

We first underscore that the defense did not offer this sexual conduct evidence to establish the victim's "general unchaste character . . . ." (Internal quotation marks omitted.) Id., 105; see also id., 104 ("the defendant bears the burden of showing that the proffered evidence . . . [is] relevant to the case, rather than . . . relevant merely to demonstrate the unchaste character of the victim" [internal quotation marks omitted]). Moreover, the defense did not argue that the victim's unchaste character was relevant to the jury's determination of her credibility. See *Demers* v. *State*, supra, 209 Conn. 156–57 ("[i]t is . . . generally held that a witness' reputation for being unchaste or a prostitute, or her prior acts of sexual misconduct are not, in and of themselves, relevant to her credibility or veracity as a witness"). Instead, as defense counsel explained during the initial rape shield hearing, he was seeking to show that the victim negotiated and willingly consummated a multipartner, multihour, sex-for-hire transaction that began at Wolcott Street and ended after the ensuing intercourse with the defendant at Taylor Street. Later, outside of the presence of the jury, defense counsel also attempted to support this theory of actual consent by establishing that the victim had a motive to fabricate her allegations of sexual assault and other crimes because she had not been paid for the transaction at the end of the night.

The defense's theory of actual consent harmonized with the proffered evidence. Defense counsel did not attempt to elicit testimony of the victim's prior conduct as a prostitute that was unrelated to the charges against the defendant. Instead, the defense wanted the jury to hear that the victim, shortly before arriving at Taylor Street, (1) offered to engage in sexual relations with Fuller and three other men for four hours in exchange for $500, and (2) engaged in consensual sexual relations with Fuller and his friend for the promise of $250. The proffered evidence had a strong temporal connection with the sexual assault and showed that the victim's offer to engage in a multipartner, multihour, sex-for-hire transaction was made to Bryan Fuller, the individual who accompanied her to Taylor Street. There can be no doubt that this excluded testimony makes the defendant's wholesale transaction theory of consent more probable. These two pieces of information could suggest that the victim brokered a consensual prostitution deal with Fuller that was only partially performed

at Wolcott Street, with an expectation that more sexual relations and complete payment would follow at Taylor Street.[16] Moreover, the excluded testimony also was relevant to the defendant's claim that the victim had fabricated her allegations. Without the testimony that the victim had offered to engage in sexual relations with multiple men, there was no evidence that would explain to the jury why she may have fabricated the sexual assault allegations as a result of not receiving the promised $250. See *State* v. *DeJesus*, supra, 270 Conn. 840 ("[e]vidence suggesting a motive for a false allegation was relevant to the jury's assessment of the victim's credibility").

Next, we address the materiality of the evidence. Material evidence is evidence that has an influence, effect, or bearing on a fact in dispute at trial. See part I B of this opinion. As we just noted, the proffered evidence was relevant to the question of whether the sexual conduct on Taylor Street was a continuing, sex-for-hire transaction. In turn, whether the sexual relations on Wolcott and Taylor Streets were part of a continuous transaction influences or bears on the critical issue in the case, namely, whether the victim consented to the sexual conduct with the defendant at Taylor Street or, alternatively, whether the defendant could reasonably have so believed that she had done so. Thus, because the evidence has a bearing on the critical issue of consent, it is material.

Our conclusion that the excluded testimonial evidence was relevant and material does not end our analysis as to whether it should have been admitted pursuant to § 54-86f (4). That provision also demands that the exclusion of such evidence deprive the defendant of a constitutionally protected right. See General Statutes § 54-86f (4).[17]

It is fundamental that the defendant's rights to confront the witnesses against him and to present a defense are guaranteed by the sixth amendment to the United States constitution. The sixth amendment provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor . . . ." "A defendant's right to present a defense is rooted in the compulsory process and confrontation clauses of the sixth amendment . . . . See, e.g., *Crane* v. *Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986). Furthermore, the sixth amendment rights to confrontation and to compulsory process are made applicable to state prosecutions through the due process clause of the fourteenth amendment. *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) (right to confrontation); see *Washington* v. *Texas*, 388 U.S. 14, 18, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) (right to compulsory process)." (Internal

quotation marks omitted.) *State* v. *West*, 274 Conn. 605, 622–23 n.26, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005).

In plain terms, the defendant's right to present a defense is "the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies." (Internal quotation marks omitted.) Id., 624. It guarantees "the right to offer the testimony of witnesses, and to compel their attendance, if necessary . . . ." (Internal quotation marks omitted.) Id. Therefore, exclusion of evidence offered by the defense may result in the denial of the defendant's right to present a defense. See, e.g., *State* v. *Crespo*, 303 Conn. 589, 604, 35 A.3d 243 (2012); *State* v. *Christiano*, supra, 228 Conn. 474

The right of confrontation is "the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . .

"Impeachment of a witness for motive, bias and interest may also be accomplished by the introduction of extrinsic evidence. . . . The same rule that applies to the right to cross-examine applies with respect to extrinsic evidence to show motive, bias and interest; proof of the main facts is a matter of right, but the extent of the proof of details lies in the court's discretion. . . . The right of confrontation is preserved if defense counsel is permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . .

"Although it is within the trial court's discretion to determine the extent of cross-examination and the admissibility of evidence, the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements [of the confrontation clause] of the sixth amendment." (Internal quotation marks omitted.) *State* v. *Baltas*, 311 Conn. 786, 798–99, 91 A.3d 384 (2014).

These sixth amendment rights, although substantial, do not "suspend the rules of evidence . . . ." (Internal quotation marks omitted.) Id., 799; see also *State* v. *Hedge*, 297 Conn. 621, 634, 1 A.3d 1051 (2010). A court is not required to admit all evidence presented by a defendant; nor is a court required to allow a defendant to engage in unrestricted cross-examination. See, e.g., *State* v. *Baltas*, supra, 311 Conn. 799. Instead, "[a] defendant is . . . bound by the rules of evidence in pre-

senting a defense . . . ." (Internal quotation marks omitted.) *State* v. *Hedge*, supra, 634. Nevertheless, "exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights . . . ." (Internal quotation marks omitted.) Id. "Thus, [i]f the proffered evidence is not relevant [or constitutes inadmissible hearsay], the defendant's right[s] to confrontation [and to present a defense are] not affected, and the evidence was properly excluded." (Internal quotation marks omitted.) *State* v. *Baltas*, supra, 799; see also *State* v. *Mastropetre*, supra, 175 Conn. 521 ("The defendant's right to confront witnesses against him is not absolute, but must bow to other legitimate interests in the criminal trial process. . . . Such interests are implicit in a trial court's accepted right, indeed, duty, to exclude irrelevant evidence . . . ." [Citations omitted; internal quotation marks omitted.]).[18]

There are special considerations in sexual assault prosecutions that trial courts must keep in mind when ruling on the admissibility of evidence, such as shielding an alleged victim from embarrassing or harassing questions regarding his or her prior sexual conduct. See, e.g., *State* v. *Christiano*, supra, 228 Conn. 469–70. "Although the state's interests in limiting the admissibility of this type of evidence are substantial, they cannot by themselves outweigh [a] defendant's competing constitutional interests." Id., 470. As we previously have observed, evidentiary rules cannot be applied mechanistically to deprive a defendant of his constitutional rights. E.g., *State* v. *Hedge*, supra, 297 Conn. 634.

"We must remember that [t]he determination of whether the state's interests in excluding evidence must yield to those interests of the defendant is determined by the facts and circumstances of the particular case. . . . In every criminal case, the defendant has an important interest in being permitted to introduce evidence relevant to his defense. Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, [as] long as it is not prejudicial or merely cumulative. . . . Whenever the rape shield statute's preclusion of prior sexual conduct is invoked, a question of relevancy arises. If the evidence is probative, the statute's protection yields to constitutional rights that assure a full and fair defense. . . . If the defendant's offer of proof is . . . more probative to the defense than prejudicial to the victim, it must be deemed admissible at trial. . . . When the trial court excludes defense evidence that provides the defendant with a basis for cross-examination of the state's witnesses, [despite what might be considered a sufficient offer of proof] such exclusion may give rise to a claim of denial of the right[s] to confrontation and to present a defense." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Rolon*, supra, 257 Conn. 176–77.

In the present case, the defendant advanced a single, continuous transaction theory of the case: (1) the victim offered to engage in sexual relations with Fuller and three other men in exchange for $500; (2) shortly before arriving at Taylor Street, the victim engaged in oral sex with Fuller and one other man at Wolcott Street; and (3) Fuller and the victim came to Taylor Street to continue the bargained for transaction. The evidence that the defense proffered was, as we previously noted, relevant and material to a single, continuous transaction theory. By excluding the evidence, however, the trial court prevented the defense from presenting its version of the events to the jury, in violation of the defendant's right to present a defense. See, e.g., *State* v. *Hedge*, supra, 297 Conn. 634 ("in plain terms the right to present a defense [is] the right to present the defendant's version of the facts . . . to the jury" [internal quotation marks omitted]). More troubling, the excluded testimony was the only evidence the defense presented to support its theory of the case. Therefore, the exclusion of such testimony completely foreclosed the ability of the defense to present this version of the events to the jurors.[19] Additionally, the defense theory related to a central and critical question before the jury, namely, whether the victim consented to the sexual conduct at Taylor Street. Accordingly, we conclude that the defendant's right to present a defense was violated when the trial court excluded the foregoing evidence. See id., 636–37.

We further conclude that the trial court's restriction of defense counsel's cross-examination of the victim limited his ability to explore her possible motive for fabricating her claims of sexual assault, in violation of the defendant's right of confrontation. See, e.g., *State* v. *Baltas*, supra, 311 Conn. 798 ("[c]ross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted" [internal quotation marks omitted]). Testimony that the victim had not been paid for sexual conduct, particularly if such admission came from the victim herself, would have allowed the jury to weigh the victim's credibility and to consider her possible motive for fabricating her allegations. We recognized the defendant's right to explore this possible motive in *DeJesus*. See *State* v. *DeJesus*, supra, 270 Conn. 840. In that case, counsel for the defendant, Luis DeJesus, Jr., who was charged with sexual assault, wanted to question the victim about "whether she had engaged in prostitution, whether she had told an investigating officer that she had engaged in prostitution, and whether [DeJesus] was aware that she had engaged in prostitution." Id., 831. Defense counsel sought to offer the testimony to establish that the sex with DeJesus was consensual and to show the victim's motive for fabricating the sexual assault claim. Id., 833–34. The defense claimed that the victim had fabricated the

charges because, when she demanded $50 after the sexual relations had concluded, DeJesus gave her only $30 and refused to pay her the balance. See id., 832–34. The trial court excluded the evidence, and we concluded that such exclusion was improper. Id., 834–35. We reasoned that, "without evidence of the victim's prior history of prostitution, the jury heard no evidence to explain why she would have had a reason to fabricate a sexual assault allegation against [DeJesus]." Id., 840. Similarly, in the present case, without the victim's testimony that she was owed $250 for engaging in sexual conduct with Fuller, a confederate of the defendant's, and another person, the jury was without the proper contextual framework to evaluate the victim's testimony.

The evidence that the defense proffered, through the testimony of the victim, was both relevant and material to a critical issue in this case, namely, consent. Moreover, the exclusion of that evidence deprived the defendant of his constitutional rights of confrontation and to present a defense. Thus, we conclude the excluded evidence was admissible under § 54-86f (4)[20] and that the trial court abused its discretion by excluding such evidence.[21] As with all improper evidentiary rulings of constitutional proportion, we now must consider whether the exclusion of the evidence was harmless beyond a reasonable doubt. See, e.g., *State* v. *Shaw*, supra, 312 Conn. 102. "Whether such error is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) Id.

After a complete and thorough review of the record, we conclude that the trial court's error was harmless beyond a reasonable doubt. We first observe that the defense had available to it other means of directly testing the victim's credibility. Indeed, defense counsel questioned the victim in the presence of the jury more than one-half dozen times about whether she had intended to collect money in exchange for having sexual relations at Taylor Street. Every time, the victim responded to the various permutations of that question with the answer "no."

Second, Fuller's testimony, although equivocal at first, also refutes the existence of an agreement on the part of the victim to engage in prostitution at Taylor

Street. In fact, he testified that the $250 he owed the victim was *not* for sex on Taylor Street. In addition, Fuller admitted that it was his intention that the victim have sex with his fellow gang members at Taylor Street but that the victim was not aware of that intention. Instead, she accompanied him to Taylor Street under the false pretense that it was there that she would receive the money he owed her.

Third, during the assault, the victim called a friend, namely, Jortner. Both the victim and Jortner testified that, during the call, the victim stated that she needed help, after which the phone was taken and a male voice exclaimed, " 'your friend's about to get fucked up . . . .' " Jortner also testified that the victim sounded scared during the call and that, after the call, she attempted to repeatedly reach the victim, but her calls went directly to voice mail. The occurrence of this call also was corroborated by the defendant's statement to the police, which was admitted into evidence.

Fourth, the victim's testimony was not the sine qua non of the state's case, nor was this case a credibility contest between the victim and the defendant. Indeed, the victim's testimony was largely uncontradicted and, in fact, supported by the testimony of the defendant's confederates, Garrett and Fuller, and the defendant's own statement to the police. Moreover, the defendant, through his statement, and Garrett and Fuller, in their testimony, all acknowledged that the victim appeared to be scared. For example, the defendant admitted to the police that he could tell "that this girl wasn't liking this and she started to look scared" and that the victim said "she was scared and afraid that we was gonna kill her."

Fifth, Garrett testified that, when the victim and the other men first entered the second floor apartment at 19 Taylor Street, he remained outside with a few others. When he did decide to enter, the apartment door was locked. Subsequently, Garrett left the apartment on three separate occasions, and, when he returned each time, the door was locked.

Sixth, and perhaps most damaging, the defendant, in his statement to the police, stated that he "grabbed [the victim] and put her head on [his] dick so she would suck it." He also said, "[t]he [victim] kept asking [Fuller] for the money, so we all went up to the second floor [at Taylor Street] . . . . The whole time this was going on the [victim] thought she was gonna get her money, but [Fuller] was telling all of us that we was gonna fuck this girl." In addition, Fuller testified that the victim was *forced* to give the defendant oral sex at Gibbs' urging. Even Garrett seemed to suggest that, at least at some point, the conduct was not consensual.

Lastly, and importantly, defense counsel was not entirely precluded from testing whether the victim con-

sented to an act of prostitution, although, as we already noted, he was precluded from exploring the defendant's continuous transaction theory. Defense counsel was allowed to question the victim about whether the $250 she was owed was for sexual intercourse on Taylor Street. The victim also testified that she had made an offer to Fuller to "do some stuff for 500 bucks" and had a conversation with Fuller in which $500 came up as a fee "for [her] services . . . ." In addition, the defendant's statement to the police contained the following admission: "Then [Fuller] grabbed me aside and said that he told [the victim] that he was gonna give her some money because he was with her all day, and she was giving him and another boy head all day." A jury could reasonably conclude, from the victim's testimony and the defendant's statement, that the victim had offered to engage in a sex-for-hire transaction. The defendant seems to concede as much in his brief: "Through the testimony [of] Fuller, Garrett and . . . Daniels, and through [the defendant's] police statement, the jury heard evidence to support a reasonable conclusion that [the victim] was a prostitute who engaged in consensual sexual acts with the men at the Taylor Street apartment." In light of all this evidence, we are convinced that the trial court's error was harmless beyond a reasonable doubt.

## II

### DOUBLE JEOPARDY CLAIM

We next address the state's claim that the Appellate Court improperly concluded that, pursuant to *State* v. *Polanco*, supra, 308 Conn. 242, vacatur is the appropriate remedy for the double jeopardy violation caused by the defendant's conviction of the three counts of conspiracy arising from a single agreement with multiple criminal objectives. As an initial matter, the state acknowledges that, under Connecticut law; see, e.g., *State* v. *Ortiz*, 252 Conn. 533, 559, 747 A.2d 487 (2000); it is a double jeopardy violation to impose cumulative punishments for conspiracy offenses if they arise from a single agreement with multiple criminal objectives.[22] Furthermore, the state recognizes that, pursuant to the United States Supreme Court's decision in *Rutledge* v. *United States*, 517 U.S. 292, 302, 116 S. Ct. 1241, 134 L. Ed. 2d 419 (1996), a cumulative conviction can be a form of punishment in and of itself because it may lead a defendant to suffer adverse collateral consequences. With these concessions in mind, the state narrowly focuses its argument on the type of remedy that exists for the defendant's conviction on the three conspiracy counts. Specifically, the state argues that "[t]his court should limit the reach of *Polanco* and . . . hold that, when a defendant receives multiple punishments for cumulative conspiracy convictions arising from a single agreement, merger, rather than vacatur, is the proper remedy . . . ." We disagree and conclude that the

Appellate Court properly determined that vacatur was the appropriate remedy for the defendant's conviction on the three conspiracy counts.

In *Polanco*, we readopted vacatur as the remedy for a cumulative conviction that violates double jeopardy protections. *State* v. *Polanco*, supra, 308 Conn. 248–49, 255. Although the holding in *Polanco* was limited to cases involving greater and lesser included offenses, in light of the issue presented, this court remarked in dictum that it was "aware of no reason why our holding, of logical necessity, would not apply with equal force to other scenarios in which cumulative convictions violate the double jeopardy clause . . . ." Id., 249 n.3. Since *Polanco*, we have "continue[d] to end our use of the merger approach" and have required that vacatur be utilized in other scenarios in which a defendant has been subject to cumulative convictions in violation of the double jeopardy clause. *State* v. *Miranda*, 317 Conn. 741, 753, 120 A.3d 490 (2015); see also id., 743, 757 (vacating conviction as to felony murder and murder counts, which violated protection against double jeopardy, because they were cumulative of capital felony count).

As we already have explained at some length, extending the vacatur approach "promote[s] inter-jurisdictional and intra-jurisdictional harmony, and better safeguard[s] against unconstitutional multiple punishments." Id., 753. Moreover, we continue to see "no substantive obstacle to resurrecting a cumulative conviction that was once vacated on double jeopardy grounds—provided that the reasons for overturning [a] controlling conviction would not also undermine the vacated conviction." Id. Accordingly, we conclude that the Appellate Court correctly determined that the trial court was required to vacate the defendant's conviction on two of the three conspiracy counts, to render judgment of conviction on one of the conspiracy counts, and to resentence him on that one conspiracy count.

The judgment of the Appellate Court is affirmed.

In this opinion ROGERS, C. J., and PALMER, McDONALD, ROBINSON and VERTEFEUILLE, Js., concurred.

[1] In accordance with our policy of protecting the privacy interests of sexual assault victims, we decline to identify the victim. See General Statutes § 54-86e.

[2] The defendant also was charged with kidnapping in the first degree in violation of § 53a-92 (a) (2) (A); however, the jury found him not guilty of that crime.

[3] We note that, subsequent to oral argument in the present case, the legislature amended § 54-86f. See Public Acts 2015, No. 15-207, § 2. The amendments to the statute, however, have no bearing on the merits of this appeal. All references to the statute are to the preamendment version of the statute, which was the version in effect at both the time of the charged crimes and the defendant's trial.

[4] We note that the state originally argued, in the alternative, that the prostitution related evidence was not material in the constitutional sense and, therefore, not admissible under § 54-86f (4) and *DeJesus*. We need not reach this argument, however, because we agree with the parties that *DeJesus* incorrectly construed the term "material."

[5] Jortner also was a witness for the state. She testified that the victim called her on the night in question and that, "[i]n the beginning, [the victim] was trying to act normal, [to] ask me if I would come . . . to Waterbury." Jortner testified that the victim started to sound scared and whispered "[t]hat she was in trouble and she was on Taylor Street." After the victim said she was in trouble, "a male voice came on the phone . . . said 'your girl's about to get fucked up,' and the phone went dead."

[6] In his brief, the defendant argues that the victim's "memory failed her on important facts." Based on our review of the record, we disagree with aspects of how the defendant has attempted to characterize the victim's testimony on cross-examination. For example, after the victim testified that she was led up to the second floor of Taylor Street, she merely admitted that she could not remember the precise position of the stairway because that was an insignificant part of a "traumatic" memory that was three years old. Moreover, although the victim was unsure of exactly how many people went into the apartment, she did list many of the entrants by name, including the defendant. Furthermore, the victim qualified that she did not "blackout" the night's events but simply could not recall whether her transition between the two rooms was prompted by a summons or by someone physically moving her.

[7] We do note, however, that Fuller repeated his testimony to the contrary, namely, that the victim was aware that she was going to Taylor Street to have sex with his fellow gang members and that the $250 he owed the victim was in return for the sexual acts at Taylor Street. Fuller also testified that, while the victim was standing next to him, he told Gibbs that she "was willing to do whatever" and explained that she wanted to have sex with them before collecting the money.

[8] The defendant was *not* one of the people Fuller called.

[9] At a divergent point in his testimony, Fuller claimed that the victim "seemed like she wanted to" have oral sex with all of the gang members— or at least wanted to up until the urination and forty ounce beer bottle episodes. Portraying Gibbs as the instigator, Fuller also stated that the defendant had not forced the victim to have oral sex or vaginal intercourse.

[10] When recalled to the witness stand, the victim denied talking to Daniels on the night of the Taylor Street incident. Moreover, the victim specifically denied having any conversation about sex toys with Daniels and also denied stating that she was going to the police because she did not receive $250. Additionally, Fuller testified that, while speaking with the victim immediately before she left, he said that he knew she was going to leave and call the police. He did not mention, however, that the victim had made such a threat.

[11] The following evidence is admissible under the first three exceptions to the rape shield statute: evidence "(1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen, disease, pregnancy or injury, or (2) offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct, or (3) any evidence of sexual conduct with the defendant offered by the defendant on the issue of consent by the victim, when consent is raised as a defense by the defendant . . . ." General Statutes § 54-86f (1) through (3).

[12] The defendant and state make additional arguments as to why § 54-86f (4) should be understood to use the term "material" in the evidentiary sense. The defendant contends that our current interpretation violates the rules of statutory construction because, if "material" refers to the constitutional standard of materiality, it would render subdivision (4)'s requirement that the exclusion violate the defendant's constitutional rights superfluous. We note, however, that this argument overlooks the possibility that the exclusion of evidence may violate a defendant's constitutional rights but nonetheless not be constitutionally material to the outcome of the trial. The defendant also refers to our conclusion in *DeJesus* that constitutionally material evidence cannot be excluded even if its prejudice to the victim outweighs its probative value and argues that such a result is absurd because it requires a trial court to ignore the plain directive of § 54-86f that the court conduct a weighing of all relevant sexual conduct evidence to determine whether its probative value is outweighed by its prejudicial effect. Finally, the defendant claims that, in states with similar rape shield statutes, courts have analyzed the materiality of sexual conduct evidence using the evidentiary standard, and that, as with the federal analogue; see Fed. R. Evid. 412 (b) (1) (C); subdivision (4) was likely intended to protect defendants in circumstances in which sexual conduct evidence does not fit within an enumerated rape shield exception but in which the exclusion of such evidence would violate

the defendant's constitutional rights.

The state claims that our current reading of § 54-86f (4) undermines the legislative purpose of the rape shield statute by dispensing with the weighing of sexual conduct evidence, thereby allowing the admission of such evidence regardless of how prejudicial it may be to the victim. The state next argues that *DeJesus* encroaches on the trial court's wide discretion over evidentiary matters by transmuting the standard of review for rulings on the admissibility of evidence under subdivision (4) from abuse of discretion to plenary review. Lastly, the state contends that *DeJesus* is not consistent with the view that we have taken in subsequent cases addressing the admissibility of evidence under § 54-86f (4).

We need not address these additional arguments because we agree that the rape shield statute's language and structure, as well as its legislative history, support our conclusion that "material," in the context of § 54-86f (4), refers to the evidentiary standard.

[13] We realize that some of our conclusions in *Mastropetre* were dicta and not binding precedent. Nonetheless, we find our reasoning in *Mastropetre* persuasive.

[14] We do not suggest, nor do we think Senator Owens meant, that evidence of prostitution on the part of a sexual assault victim will be admissible in all cases. Instead, such evidence would be admissible in a prosecution for sexual assault only when it is *so relevant* and *material* to a critical issue that its exclusion would violate the defendant's constitutional rights, for example, when the defendant raises consent as a defense, such as in the present case.

[15] Section 1-2z became effective on October 1, 2003; see Public Acts 2003, No. 03-154, § 1; nearly one year before *DeJesus* was decided on September 7, 2004. See *State* v. *DeJesus*, supra, 270 Conn. 826.

[16] Although this theory was largely refuted by Fuller's testimony that the victim did not know she was going to Taylor Street to engage in sexual activities, it is nonetheless relevant. See, e.g., *State* v. *Rinaldi*, 220 Conn. 345, 353, 599 A.2d 1 (1991) ("[t]o be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion, even to a slight degree").

[17] It is hard to imagine a scenario in which evidence is *so* relevant and material to a critical issue in a case but could nonetheless be excluded without violating a defendant's constitutional rights. On the other hand, we can imagine a situation in which evidence is relevant and material to a critical issue *but not so much* so that its exclusion would deprive a defendant of his or her constitutional rights. One example is a sexual assault prosecution in which consent is raised as a defense. Suppose that, in that case, the alleged victim is a prostitute. Certainly, it can be argued that the alleged victim's status as a prostitute is relevant and material to the issue of consent, a critical issue in any sexual assault prosecution in which it is raised as a defense. See, e.g., *Demers* v. *State*, supra, 209 Conn. 159 (evidence of victim's prostitution "could lead to a reasonable conclusion that the victim had agreed on at least one occasion in the past to perform sexual acts for money and that under the circumstances that conclusion would have been relevant to the issue of consent in the petitioners' criminal trial"). It is possible, however, that such evidence is not *so* relevant and material to the critical issue of consent under the facts of that particular case and therefore could be excluded without violating the defendant's constitutional rights. For instance, perhaps the defendant was unaware, at the time of the alleged assault, that the victim was a prostitute. Under those facts, it seems likely that the evidence of prostitution could be excluded without violating the defendant's constitutional rights. Another example may be a case in which there are no facts to support the allegation that the assault was in fact a sex-for-hire transaction, for example, when there is no exchange of money or no offer of proof that the victim proposed to engage in sex for money. In such instances, when the defendant did not know of the victim's status as a prostitute or the facts do not suggest that the victim and the defendant understood that they were engaged in a sex-for-hire transaction, it is plausible that evidence that the victim has engaged in past acts of prostitution, despite its relevance and materiality to consent, could be excluded without violating the defendant's constitutional rights.

Excluding the evidence in the foregoing situations would be consistent with our precedent on this issue. In *Demers*, we concluded that evidence of the victim's prior arrest for prostitution should have been admitted at trial when the petitioners, Mark Demers and William J. Corcoran, Jr., argued that the sexual conduct between them and the victim was a sex-for-hire transaction. Id., 158–59. However, the connection between the consent

defense and the victim's prior arrest in *Demers* was stronger than a mere allegation that the victim had agreed to sex in exchange for money. The victim's prior arrest occurred after she propositioned a plainclothes police officer at the intersection of Central Avenue and Grove Street in Waterbury. Id., 158. Similarly, Demers and Corcoran contended that the victim had approached them at North Elm Street and Cherry Street in Waterbury. Id. Therefore, the victim's prior arrest became so relevant and material to a critical issue because she was arrested for propositioning a police officer only a few blocks west of where Demers and Corcoran contended she propositioned them.

The facts in *DeJesus* also suggested a connection between the defendant's consent defense and the victim's prior prostitution. In *DeJesus*, the defendant, Luis DeJesus, Jr., gave the victim $30. *State* v. *DeJesus*, supra, 270 Conn. 832. At trial, DeJesus wanted to present evidence that the victim admitted to an investigating officer that she was a prostitute and that DeJesus, at the time of the alleged assault, knew she was a prostitute. Id., 833. In that case, we concluded that the evidence should have been admitted, in part, because, without it, the jury was deprived of the "necessary contextual framework to evaluate properly [DeJesus'] version of [the] events," i.e., why he gave the victim $30. Id., 839. Additionally, the present case is consistent with the foregoing. In this case, as we previously discussed, there also is a strong connection between the consent defense and the sexual conduct evidence. First, there is the temporal relationship. It was merely hours before the charged conduct occurred that the victim offered Fuller to engage in sexual conduct with him and three other men for $500. Second, the Wolcott Street and Taylor Street sexual conduct is connected by common actors, namely, Fuller and the victim. Thus, these cases all involved instances where the circumstances from which the sexual assault allegations arose made the victim's prior prostitution so relevant and material to a critical issue that its exclusion violated the defendant's constitutional rights. In the absence of the highlighted facts, however, the evidence likely could have been properly excluded.

[18] Insofar as *Mastropetre* suggested, or has been read to suggest, that a defendant's constitutional right to present evidence that is so relevant and material to a critical issue must bow to the state's general interest in protecting a sexual assault victim from prejudice; see *State* v. *Mastropetre*, supra, 175 Conn. 521; that suggestion was incorrect. In *Mastropetre*, we rightly acknowledged that a defendant's right to confront witnesses was not absolute and must yield to "other legitimate interests . . . ." (Internal quotation marks omitted.) Id. We noted that one of those legitimate interests was the exclusion of evidence that has "a greater prejudicial than probative effect." Id. In making that observation, however, we cited a case in which the prejudice we were concerned with was the prejudice to the defendant, not a third party. See id. We do not think that the prejudice to the victim ever could outweigh a defendant's right to present evidence that is *so relevant and material to a critical issue* that its exclusion would violate a defendant's constitutional rights. Such a suggestion was dictum and should not be followed.

[19] We acknowledge that, when the defense recalled the victim for its case-in-chief, the victim was allowed to testify that she offered to "do some stuff for 500 bucks," and, when asked if the $500 was a fee for her services, the victim responded, "[r]ight, for Wolcott Street." Defense counsel was not allowed, however, to further explore the specifics of the offer to "do some stuff" or whether it was limited to Wolcott Street. Thus, the defense was effectively precluded from presenting its continuous transaction theory.

[20] We note that § 54-86f requires that a trial court, after determining that sexual conduct evidence is admissible under one of the four enumerated exceptions, proceed to determine whether the probative value of the evidence outweighs its prejudicial effect on the victim. See, e.g., *State* v. *Crespo*, supra, 303 Conn. 602. Under subdivision (4), however, that step is unnecessary because it is subsumed in the relevancy and materiality determinations. That is, all evidence that is *so* relevant and material to a critical issue that its exclusion would violate the defendant's constitutional rights is, by its nature, more probative to the defense than prejudicial to the victim. See, e.g., *State* v. *Rolon*, supra, 257 Conn. 177; see also *State* v. *DeJesus*, supra, 270 Conn. 844 ("evidence cannot be excluded as more prejudicial to the victim than probative when that exclusion has already been determined to violate the defendant's constitutional rights").

In their supplemental briefs, both parties argued that this court's construction of § 54-86f (4) in *DeJesus* was incorrect because, among other things, it dispensed with the statute's requirement that the probative value of the

evidence be weighed against its prejudicial effect. The defendant claims that *DeJesus* led to the absurd result of requiring trial courts to ignore the plain language of the statute that required the application of this balancing test, and the state contends that *DeJesus* "contravenes the legislative purposes behind the rape shield statute" by allowing prior sexual conduct evidence to be admitted without consideration of the prejudicial effect that such evidence has on the victim. We assume that the parties would make the same arguments regarding our conclusion that the balancing test is subsumed in subdivision (4)'s relevancy and materiality determinations. Nevertheless, we are not persuaded.

First, trial courts are not instructed to ignore the weighing required by § 54-86f. Indeed, such weighing is still required when a defendant offers evidence under the other exceptions in § 54-86f. Moreover, our holding in this case does not ignore the legislature's mandate that the court admit only evidence that is more probative to the defense than prejudicial to the victim. Instead, it acknowledges that, when such evidence is *so relevant and material* to a critical issue that its exclusion would deprive a defendant of a constitutionally protected right, no amount of prejudice would outweigh its probative value. Second, this conclusion does not contravene the legislative purpose of § 54-86f. The rape shield statute is intended to prevent a defendant from introducing *irrelevant* evidence of the victim's prior sexual conduct, shielding the victim from embarrassment and harassment. That purpose will continue to be served under our holding in the present case because subdivision (4) does not permit the admissibility of irrelevant evidence.

[21] The concurring justice concludes that the challenged evidence is neither relevant nor material to the defendant's defense of consent or reasonable belief of consent and, therefore, that the trial court did not abuse its discretion in excluding the evidence. Instead, she argues that there is no nexus between the conduct on Wolcott Street, including the victim's offer to engage in a multipartner, multihour, sex-for-hire transaction, on the one hand, and the incident on Taylor Street, on the other. The concurring justice further contends that, at its essence, the defendant's consent defense is nothing more than an argument that the victim had engaged in an act of prostitution earlier in the day and, therefore, must have engaged in a similar act at Taylor Street. Certainly, the concurring justice might be correct if the defendant was making such an argument and the only proffered evidence was the prior act of prostitution with Fuller and one other person. See, e.g., *State v. Shaw*, supra, 312 Conn. 104–105 (noting that evidence offered in "an . . . attempt to establish the victim's general unchaste character . . . [is] prohibited by [§ 54-86f]" [internal quotation marks omitted]). That, however, is not the case. Instead, the defendant's consent theory is that the victim entered into a consensual, multiperson prostitution transaction that began on Wolcott Street and continued at Taylor Street. In addition, the proffered evidence includes not only testimony regarding the prior act of prostitution with Fuller and one other person, *but also* testimony that the victim offered to engage in sexual relations with Fuller *and three other men* for four hours in exchange for $500. The concurring justice gives the evidence of such an offer little weight by contending that it was never accepted by Fuller. Moreover, the concurring justice argues that we cannot refer to any testimony that "evinces that such a transaction was bargained for, agreed [on], or acted out." Our review of the trial transcript, however, uncovers testimony from the victim suggesting that such an offer was bargained for and carried out. In turn, we did not discover any testimony suggesting that Fuller did not accept the offer. During the state's case-in-chief, on cross-examination and outside the presence of the jury, the victim confirmed that she had "a conversation with . . . Fuller [in which she] told him that, for $500, [she] would have sex with him and three other people for four hours . . . ." She was then asked, "[a]nd then you did have sex. [Fuller] didn't have $500, right? That's what he told you?" The victim responded: "[r]ight," but the prosecutor's hearsay objection was sustained. At a later point in the trial, this time during the defense's case-in-chief and in the jury's presence, the victim testified that she told Fuller she would "do some stuff for 500 bucks." Then, after the jury had been excused, the victim testified that she had offered to provide sexual services to four men for $500 and that the $500 was supposed to be for Wolcott Street. Surely, the victim's affirmation that she made the offer and then engaged in sexual conduct suggests that such a transaction was bargained for, agreed on, and acted out. Moreover, this testimony does not suggest that Fuller did not accept the victim's offer. It is true that the second time the victim was questioned about this offer, she testified that the offer was for Wolcott Street, but that is a question of fact for the jury to decide. In addition to the foregoing testimony regarding the $500 offer, there was evidence that the victim had engaged in sexual activities with two men just hours before arriving at Taylor Street with Fuller, the purported deal broker.

The concurring justice also argues that the defendant's consent theory is

contradicted by the testimony of both the victim and Fuller, as well as the defendant's own statement to the police. Such a consideration, however, goes to the weight of the defendant's theory and the evidence proffered, not its admissibility. Cf. *State* v. *Andrews*, 313 Conn. 266, 275, 96 A.3d 1199 (2014) ("[t]o be relevant, the evidence need not exclude all other possibilities" [internal quotation marks omitted]). In addition, the concurring justice overlooks the contradictions in Fuller's testimony and assumes that the defendant's statement proves more than it actually does. First, acknowledging that there was no money at Taylor Street for the victim is not the same as admitting the conduct was not consensual. Second, although the defendant's other statements may suggest that the sex was compelled, they do not necessarily require such a conclusion. For example, the victim did not have to like that the defendant and others were "smackin her ass" in order for the sexual conduct to be consensual. Finally, that Fuller did not engage in sexual conduct with the victim at Taylor Street does not refute that Fuller was the link between Taylor Street and Wolcott Street. In fact, we do not understand this suggestion considering that Fuller engaged in sex with the victim at Wolcott Street and accompanied the victim from Wolcott Street to Taylor Street.

This is not a case, as the concurring justice suggests, in which the prior sexual act has absolutely no connection to the charged sexual assault. Fuller, the defendant, and their confederates were members of the same gang and, therefore, knew each other. Moreover, Fuller was not the victim's romantic partner. Instead, Fuller was the victim's sexual customer who, if the defendant's theory is believed, brokered a multipartner, multihour, sex-for-hire transaction that began on Wolcott Street and ended on Taylor Street. Moreover, the sexual conduct on Wolcott and Taylor Streets was close in time, *and* the prior act of prostitution was not the only evidence that the defense proffered in support of the defendant's theory. Indeed, the defense also presented the victim's offer to engage in sexual activities with four men for four hours for $500. Our conclusion in the present case does not lead to the conclusion that prostitutes cannot be raped or that prior acts of prostitution always will be admissible in sexual assault prosecutions when the victim is alleged to be a prostitute. As we noted previously, more than a mere allegation of the victim's prior acts of prostitution is required for evidence of such acts to be admissible under § 54-86f (4).

[22] We note that the state conceded before the Appellate Court that the defendant's conviction on the three conspiracy counts was "supported by evidence of a single agreement to sexually assault the victim." (Internal quotation marks omitted.) *State* v. *Wright*, supra, 144 Conn. App. 747.